**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

| | | |
|---|---|---|
| STREAM, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 2:17-cv-02702-TLP-dkv |
| v. | ) | |
| | ) | JURY DEMAND |
| THE PEP BOYS – MANNY, MOE & | ) | |
| JACK, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER DENYING IN PART AND GRANTING IN PART DEFENDANT'S MOTION TO DISMISS

Defendant, The Pep Boys – Manny, Moe & Jack, Inc. ("Pep Boys"), moved to dismiss Plaintiff Stream, LLC's ("Stream") Complaint for Declaratory Judgment and Damages, (ECF No. 1-1.)  Stream responded (ECF No. 13) to the Motion to Dismiss and Incorporated Memorandum of Law ("Motion," ECF No. 12), and Pep Boys replied (ECF No. 14).  For the reasons below, the Court DENIES IN PART AND GRANTS IN PART Pep Boys' Motion.

## BACKGROUND

To rule on Pep Boys' Motion, the Court assumes that the following well-pleaded facts taken from the Complaint are true.

### I.     The Contract's Terms

On July 14, 2015, Stream and Pep Boys entered into a multi-state remarketing contract (the "Contract," ECF No. 1-1 at PageID 33.)  The Contract provides for the remarketing of "Motor vehicles," defined as "Collateral," which are the "subject matter of service work order(s) or which are abandoned" on Pep Boys' property, and "for which Stream has taken all

steps required under federal, state or local law, rule, or regulation to secure the legal right to possession and remarketing." (ECF No. 1-1 at PageID 33.) Under Section 1.4 of the Contract, Stream agreed to provide a suite of services for Pep Boys related to remarketing or, if a Pep Boys' customer paid his or her bill, "redemption."

> **1.4     Remarketing Services.** Stream will perform the following Services for [Pep Boys]:
>
> A.     Coordinate the remarketing process with [Pep Boys'] Locations and Auctions for [Pep Boys'] Collateral.
>
> B.     Request, obtain, and review current owner, lienholder, and title status of Collateral and pursue procurement of appropriate title documents necessary for the remarketing of Collateral.
>
> C.     Engage and manage Auctions to inspect and photograph Collateral for purpose of obtaining pertinent information used to determine vehicle(s) condition so that they may be offered for sale by Auction. Stream will engage the Auction and will facilitate the consignment of Collateral at/to Auction.
>
> D.     Facilitate, manage and coordinate return of Collateral by Auction to Location in the event Customer brings Service Agreement(s) current and is no longer in default of the Service Agreement(s).
>
> E.     Facilitate and arrange for the provision of any and all reconditioning services, transportation and vehicle title services, on the vehicles to be remarketed, as requested by [Pep Boys].

(*Id.*) Pep Boys granted Stream a limited power of attorney to allow Stream to perform the services listed above. (*Id.* at PageID 34.) In addition, Stream expressly warranted in Section 5.0 of the Contract that it "shall secure or has secured all permits, licenses, regulatory approvals and registrations required to render Services set forth herein . . . . [and] that it shall take all steps necessary to obtain the legal rights to secure and remarket all Customer vehicles and accounts referred to Stream for consignment." (*Id.* at PageID 34–35.)

In return for Stream's services, the parties agreed to the following fee and compensation structure in Sections 1.6 and 4.0:

**1.6**      **Fees.** [Pep Boys] shall pay Stream in accordance with the fee schedule set forth in Exhibit B [the "Fee Schedule"]. Any services not contemplated by the [Fee Schedule] and that individually or in the aggregate exceed $350.00 shall be agreed upon by [Pep Boys] and Stream on a case by case basis by an amendment to this Agreement; any services which individually or in the aggregate are less than $350.00 shall be approved via email by Pep Boys designated personnel.

**4.1**      Payment, in accordance with the fees set forth on [the Fee Schedule] attached hereto, shall be made by [Pep Boys] to Stream out of the sale proceeds at such time as the vehicle is sold or redeemed. [Pep Boys] agrees and acknowledges that [Stream] has the right and may charge for those items listed on [the Fee Schedule], items not listed on [the Fee Schedule] which do not exceed $350.00, and for any services not contemplated by the schedule on [the Fee Schedule] that exceeds $350.00 which are agreed upon by [Pep Boys] and [Stream] on a case by case basis by an amendment to this Agreement.

**4.2**      [Pep Boys] reserves the right to request reasonable documentation of expenses incurred as a result of Services performed [under the Contract] prior to payment.

**4.3**      Net proceeds will be processed on a weekly basis by ACH, on a day agreed upon by [Pep Boys] and Stream for all vehicles sold for the prior seven (7) day period.

(*Id.* at PageID 34.) The Fee Schedule provides for a guarantee of "positive weekly funds," and the assessment of any additional fees "as approved in writing." (*Id.* at PageID 41.) Stream claims Pep Boys owes Stream, whether its services net positive or negative returns for Pep Boys. That said, any time net proceeds were negative, or applying the "Remarketing Success" fee of ten percent of net proceeds in the Fee Schedule would have created a deficit for Pep Boys, Stream did not charge the Remarketing Success fee. Stream explains that the Remarketing Success fee was necessary because Pep Boys' needs of removing and auctioning vehicles included vehicles

worth less than the minimum necessary auction value ($765.00 per vehicle) to generate a profit. (*See* ECF No. 13 at PageID 549.)[1]

## II.    The Parties' Relationship Under the Contract

From July 2015 until March 2017, the parties operated according to the Contract.  When a Pep Boys' service center customer had abandoned a vehicle or whose owner had defaulted on his or her service agreement, that service center would submit an Abandoned Vehicle Worksheet to Pep Boys' Store Support Center ("SSC"), which would forward the information to Stream for removal and rendering of the applicable services.  (ECF No. 1-1 at PageID 13.) Sometimes, these services included engaging an auto auction to resell the vehicle, but other times it was more cost-effective to crush the vehicle or otherwise dispose of it.  (*Id.*)  Stream consulted with Pep Boys about these alternative forms of disposition.  Stream alleges that Pep Boys "ratified such alternative forms of disposition," and paid invoices for those services through June 19, 2017, in the amount of $108,730.27.  (*Id.* at PageID 14.)  In particular, the invoices that Pep Boys paid included fees for vehicles sold at auction, crushed or otherwise disposed of, removed from Pep Boys' service centers by held in storage by Stream, and redeemed by the original owners at Pep Boys' request, as well as pass-through fees to entities with whom Stream had or has third-party contracts to perform the services under the Contract. (*Id.*)

### A.    Regulatory Issues Affecting Performance

The parties agreed for Stream to provide services for Pep Boys in thirty-five (35) U.S. states and Puerto Rico under the Contract.  (*Id.* at PageID 15.)  After executing the Contract, the

---

[1] Pep Boys knew that, to generate a profit at auction, the minimum necessary vehicle value, factoring average costs, was $765.00.

parties learned that local regulations made it impossible for Stream to remarket vehicles in nineteen states. (*Id.*) Stream refers to these nineteen states as the "Removal States." In the Removal States, Stream explains that "removal transfers title to the auction or other removal agent, neither Stream nor [Pep Boys] has any claim to removed vehicles from that point forward, and neither [Stream nor Pep Boys] can render further Services." (*Id.*)

Additionally, in eight other states, although Stream could perform the full suite of services, Stream and Pep Boys concluded "after entering into the Contract that it is not cost-effective under local regulations for Stream to perform certain services, such as engaging an auction to remove the vehicle from [Pep Boys'] property and ultimately re-sell it, given the low value of the vehicles [that Pep Boys identified]." (*Id.* at PageID 16.) Stream refers to these eight states as the "Cost-Prohibitive States." Stream began informing Pep Boys of these regulatory issues in some Removal or Cost-Prohibitive States in November 2016 and continued to do so through May 2017. Despite this knowledge, Pep Boys' service centers continued to submit Abandoned Vehicle Worksheets to its SSC, and then forwarded them to Stream. (*Id.* at PageID 19.)

**B.     The Parties' Attempts to Salvage the Contract and Termination**

In April 2017, Marianne Simshauser, Stream's General Manager, met with David Mulliner, Pep Boys' Vice President for Loss Prevention, and Phil Roundtree, Loss Prevention Analyst for Pep Boys, about the regulatory landscape. (*Id.* at PageID 20.) Ms. Simshauser recommended modifying the Contract to lower the costs for Stream's services "for the [vehicles] that remained in Stream's custody to reduce losses to [Pep Boys] that would otherwise result from the [vehicles'] low value." (*Id.*) Ms. Simshauser proposed amending the Contract to include a Revised Fee Schedule, which Stream attached to the Complaint as Exhibit

D.  (*Id.* at PageID 512.)  Messrs. Mulliner and Roundtree responded by requesting that Stream compile a list of the current costs associated with the disposal process so Pep Boys could get a sense of the costs that it was incurring under the current Contract.  (*Id.* at PageID 20–21.)

Between April 2017 and June 15, 2017, Stream depleted its inventory of Pep Boys' vehicles in eight states, but Stream maintains that it continues to provide services under the Contract in twenty-three (23) states.  On June 13, 2017, Pep Boys sent a Termination Letter to Stream terminating the Contract "for cause" because Stream "lack[ed] the ability to remarket abandoned vehicles in 29 states – including many of Pep Boys most significant markets," which to Pep Boys "constitut[ed] a clear breach of the [Contract]."  (*Id.* at PageID 514.)  As to outstanding invoices for fees, Pep Boys stated that under Section 4.1 of the Contract, "actually selling the abandoned vehicles is a condition precedent to any payment under the [Contract] – and until a vehicle is actually sold, Stream is not entitled to the payment of any fees."  (*Id.* at PageID 515.)  Pep Boys continued that "[n]otwithstanding the foregoing, Pep Boys acknowledges that Stream was able to sell a small number of abandoned vehicles at auction and, in some cases, may be entitled to appropriate fees out of the revenues of those sales."  (*Id.*)  So Pep Boys suggested it would be open to paying some invoices.  (*Id.*)

To date, Stream has billed Pep Boys for the past due amount of $133,157.50 that it claims Pep Boys owes it for services through June 15, 2017.  Stream also claims Pep Boys owes $132,158.66 more for services incurred since June 15, 2017, but not yet billed for.  (*Id.* at PageID 28.)  Stream also claims that Pep Boys is responsible for fees associated with the continued storage of 815 vehicles that Stream removed from Pep Boys' service centers, which total $342,532.32 as of the Complaint's filing.  (*Id.* at PageID 22.)   Stream sues under breach of contract (Count I) for the payment of past-due invoices and service charges totaling

$133,157.50.  Stream also seeks a declaratory judgment (Count II) over its rights under the Contract, including attorney's fees (Count IV).  In the alternative from the breach of contract claim, Stream claims that Pep Boys would be unjustly enriched if the Court were to absolve it from having to pay these past-due or incurred-but-not-yet-billed invoices and services charges (Count III).

## LEGAL STANDARD

Rule 8(a)(2) of the Federal Rules of Civil Procedure requires only "a short and plain statement of the claims showing that the pleader is entitled to relief."  To survive a motion to dismiss under 12(b)(6), a "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 566 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see Engler v. Arnold*, 862 F.3d 571, 575 (6th Cir. 2017).

Though a court will grant a motion to dismiss if a plaintiff has no plausible claim for relief, a court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff."  *DirecTV v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007).  "A complaint should only be dismissed if it is clear to the court that 'no relief could be granted under any set of facts that could be proved consistent with the allegations.'"  *Herhold v. Green Tree Serv., LLC*, 608 F. App'x 328, 331 (6th Cir. 2015) (quoting *Trzebuckowski v. City of Cleveland*, 319 F.3d 853, 855 (6th Cir. 2003)).  "Dismissal of the action is proper if there is an absence of law to support the type of claim made, if the facts alleged are insufficient to state a valid claim, or if, on the face of the complaint, there is an insurmountable bar to relief."  *Doe v. Ohio*, No. 2:91-CV-464, 2012 WL 12985973, at *5 (S.D. Ohio Feb. 16, 2012) (citations omitted).  Under Rule 12(b)(6), the Court

cannot consider a question of fact on a motion to dismiss. *See Kaldy v. Urshow.tv, Inc.,* No. 2:16-CV-54, 2017 WL 104148, at *3 (E.D. Tenn. Jan. 10, 2017) (citing *Ecclesiastical Order of the ISM of AM, Inc. v. IRS*, 725 F.2d 398, 403 (6th Cir. 1984) (Jones, J., concurring in part and dissenting in part); *Mike Vaughn Custom Sports, Inc. v. Piku*, 15 F. Supp. 3d 735, 753 (E.D. Mich. 2014)).

## ANALYSIS

### I.    Stream's Breach of Contract and Declaratory Judgment Claims

In essence, Pep Boys argues that the Court should dismiss Stream's Complaint because Pep Boys is not responsible for Stream's breach of Section 5.0 of the Contract. Pep Boys also argues Contract's terms unambiguously set out the parties' obligations and Stream's compensation, and those terms do not cover Stream's claims for damages.

A plaintiff wanting to prevail on a breach of contract claim must prove the elements of "(1) the existence of an enforceable contract, (2) nonperformance amounting to a breach of the contract, and (3) damages caused by the breach of contract." *Ingram v. Cendant Mobility Fin. Corp.*, 215 S.W.3d 367, 374 (Tenn. Ct. App. 2006) (quoting *ARC LifeMed, Inc. v. AMC-Tenn., Inc.*, 183 S.W.3d 1, 16 (Tenn. Ct. App. 2005)); *Hampton v. Macon Cty. Bd. of Educ.*, 2014 WL 107971, at *9 (Tenn. Ct. App. 2014). [2]

Stream's Complaint sufficiently pleads these elements. Stream claims that Pep Boys owes it fees for services under the Contract's Fee Schedule because Stream has substantially performed under the Contract, and Pep Boys' nonpayment of the outstanding invoices from March to June 2017 in the amount of $133,157.50 breached Section 4.0 of the Contract and has damaged Stream in the amounts past due, plus interest. Even so the Motion challenges the

---

[2] Under Section 11.9 of the Contract, the Court analyzes the Contract under Tennessee law.

second and third elements of the claim because Pep Boys argues it does not owe Stream either performance or damages because Stream committed an uncured, material breach, and the Contract's unambiguous terms do not provide for reimbursement of the fees that Stream seeks in the Complaint.

### A.     Breach of Contract

Pep Boys argues that Stream is the party at fault for breach of contract, and thus cannot now ask the Court to rewrite the contract to "somehow hold Pep Boys financially responsible for Plaintiff's failure." (ECF No. 12 at PageID 537.) A party who first committed an uncured, material breach of a contract cannot claim damages based on the other party's later material breach. *Carter v. Krueger*, 916 S.W.2d 932, 936 (Tenn. Ct. App. 1995) (citing *John P. Saad & Sons, Inc. v. Nashville Thermal Transfer Corp.*, 715 S.W.2d 41, 47 (Tenn. 1986); Restatement (Second) of Contracts § 237 cmt. b (1979)).

Here, Stream expressly promised under the heading titled "REPRESENTATIONS AND WARRANTIES" that it would "secure or has secured all permits, licenses, regulatory approvals and registrations required to render Services set forth herein . . . . [and] that it shall take all steps necessary to obtain the legal rights to secure and remarket all Customer vehicles and accounts referred to Stream for consignment." (ECF No. 1-1 at PageID 34–35.) The Court finds that this language—and thus Stream's obligations under the Contract—are unambiguous. Stream argues that it did secure all the necessary licenses and approvals to render services, including in the Removal States, and that "[a]dditional licenses would not have prevented the transfer of title to the third-party removal agent upon a vehicle's removal from [Pep Boys'] property." (ECF No. 13 at PageID 559.) Stream also argues that Stream's inability to provide "additional"

services after removal "did not prevent Stream from substantially complying with the Contract by removing vehicles in the first place." (*Id.*)

Stream's argument is unpersuasive because, although it may have been able to obtain whatever permits, licenses, and regulatory approvals were available in a given jurisdiction, it failed to secure specifically what it needed to "remarket all Customer vehicles and accounts referred to Stream for consignment." (*See* ECF No. 1-1 at PageID 34–35.)  Although Stream could remove abandoned vehicles from Pep Boys' service centers, a plain reading of the Contract shows that the essential services agreed upon were to facilitate and assist with the remarketing, resale or redemption of the vehicles, (*see* ECF No. 1-1 at PageID 33.)[3]  Under Section 5.0, the failure to perform due diligence on the regulatory landscape was not mutual, as Stream argues.  Stream assumed the risk—and ultimately the failure—of being able to perform the Contract's services.  Stream therefore likely breached Section 5.0 of the Contract.  But the Court declines to determine how much Stream may have breached this provision at this stage of the litigation.

And the degree of Stream's purported breach affects its rights and Pep Boys' obligations under the Contract.  If the breach of contract were "slight or minor, as opposed to material or substantial, the nonbreaching party is not relieved of his or her duty of performance, although he or she may recover damages for the breach." *M & M Elec. Contractor, Inc. v. Cumberland Elec. Membership Corp.*, 529 S.W.3d 413, 423 (Tenn. Ct. App. 2016), *app. denied* (Tenn. Mar. 9, 2017) (quotation marks and citations omitted).  On the other hand, when one party to a contract materially breaches the same, cannot perform, or manifests an intention to no longer

---

[3] Even the definition of "Collateral" contemplates that "Stream has taken all steps required under federal, state or local law, rule or regulation *to secure the legal right to possession and remarketing*.  (*See* ECF No. 1-1 at PageID 33)(emphasis added).

honor the contract, it excuses the non-breaching party from further performance.  *See Markow v. Pollock*, No. M200801720COAR3CV, 2009 WL 4980264, at *5 (Tenn. Ct. App. Dec. 22, 2009) (citing *Lopez v. Taylor,* 195 S.W.3d 627, 635 (Tenn. Ct. App 2005)).

Yet it would be inappropriate for the Court to determine whether Stream materially breached the Contract at this stage in the litigation.  Whether a party has fulfilled its obligations under a contract is a question of fact for the fact-finder.  *Forrest Constr.*, 337 S.W.3d at 225 (citing *Carter v. Krueger*, 916 S.W.2d 932, 934–35 (Tenn. Ct. App. 1995)).

Moreover, Stream has sufficiently alleged that it substantially performed under the Contract to survive Pep Boys' Motion by alleging, among other things, that over the life of the Contract, it has removed around 2,172 vehicles from Pep Boys' service centers, that it continued to remove vehicles from Pep Boys' service centers as requested even after Pep Boys knew that Stream could not render remarketing services in the Removal States.  "[W]hether a party has substantially performed depends on what it was the parties bargained for in their agreement."  *Tenn. Div. of United Daughters of the Confederacy v. Vanderbilt Univ.*, 174 S.W.3d 98, 117 (Tenn. Ct. App. 2005).  Contrary to the Tennessee Court of Appeals' finding in *Vanderbilt* that "no reasonable fact—finder could find that the party in default has substantially performed, *see id.* at 117, the Court determines that a jury here could reasonably find that Stream's actions constitute substantial performance, also making dismissal inappropriate.

It appears to the Court at this stage that Stream faces an uphill battle in prevailing on its breach of contract claim.  The Court, however, declines to dismiss the claim based on Stream's alleged prior material breach.

B.       **Stream's Damages Claims**

As mentioned, Stream claims $133,157.50 in unpaid, past-due invoices from March 3, 2017 to June 2017 as part of its breach of contract claim, $132,158.66 in unbilled invoices for fees incurred since June 15, 2017, and $342,532.32 for storage fees that continue to accrue. (ECF No. 1-1 at PageID 14–15.)[4]  While "the amount of damages to be awarded in a particular case is essentially a fact question," determining the proper measure of contractual damages is a question of law.  *Sanders v. Breath of Life Christian Church, Inc.*, No. W2010-01801-COA-R3CV, 2012 WL 114279, at *22 (Tenn. Ct. App. Jan. 13, 2012) (quoting *Beaty v. McGraw*, 15 S.W.3d 819, 827 (Tenn. Ct. App. 1998)).  Thus, the Court may determine what damages the Contract covers in considering the Motion.  This analysis requires interpreting the Contract's relevant provisions.

Stream also claims damages for fees incurred from vehicles that it neither sold nor redeemed.  (ECF No. 1-1 at PageID 25–27.)  Pep Boys argues that the Contract's language does not allow Stream to claim these damages.  Pep Boys argues that the Contract's plain, unambiguous terms provide that all payments from Pep Boys to Stream would be from the "sale proceeds at such time as the vehicle is sold or redeemed" by Stream, (*see* ECF No. 1-1 at PageID 34), meaning that "[Stream] agreed to a compensation structure that was contingent upon [it] selling or redeeming the vehicle."  (ECF No. 12 at PageID 536.)

Stream counters Pep Boys' plain language argument by asserting that if the Court credits Pep Boys' positions that (1) "Stream is not entitled to collect fees for any vehicles that were not

---

[4] The Court determines that Stream claims these latter amounts under its declaratory judgment and unjust enrichment claims.  Stream appears to contend in its Response that Pep Boys never terminated the contract because it did not give notice of termination, or that Stream's damages all accrued before Pep Boys terminated the Contract. But the Termination Letter nullifies that argument.  (*See* ECF No. 1-1 at PageID 514.)

sold (or, in some instances, redeemed by customers,)" and (2) "actually selling the abandoned vehicles is a condition precedent to any payment under the [Contact]," it would nullify much of Stream's claimed damages. (*See* ECF No. 1-1 at PageID 25.) These arguments require the Court to interpret the Contract's terms.

It is well settled "that the intent of the contracting parties at the time of executing the agreement should govern," *Planters Gin Co. v. Fed. Compress & Warehouse Co., Inc.*, 78 S.W.3d 885, 890 (Tenn. 2002), and the Court determines the parties' intentions "based upon the usual, natural, and ordinary meaning of the language used." *Sanders*, 2012 WL 114279, at *22 (citing *Guiliano v. Cleo, Inc.*, 995 S.W.2d 88, 95 (Tenn. 1999); *Bob Pearsall Motors, Inc. v. Regal Chrysler–Plymouth, Inc.*, 521 S.W.2d 578, 580 (Tenn. 1975)). "When the terms of a written interest are unambiguous, the interpretation is a matter of law for the Court, and it is the Court's duty to enforce the contract according to its plain terms." *McCullar v. Starnes*, No. 11-2262, 2012 WL 1097349, at *6 (W.D. Tenn. Mar. 30, 2012) (quoting *Paterson v. Anderson*, No. 3:10-cv-0464, 2012 U.S. Dist. LEXIS 4835, at *20 (M.D. Tenn. Jan. 17, 2012) (citing *Whitehaven Community Baptist Church v. Holloway*, 973 S.W.2d 592, 596 (Tenn. 1998)). "If the contract language is unambiguous, then the parties' intent is determined from the four corners of the contract." *Id.* (quoting *Ray Bell Const. Co. v. State, Tennessee Dep't of Transp.*, 356 S.W.3d 384, 386 (Tenn. 2011) (quotation marks omitted)).

### 1. Fees

Surprisingly, neither party mentions Section 1.6 in their briefs, which contains crucial language on what Stream could charge Pep Boys for in fees. Section 1.6 provides "[a]ny services not contemplated by the [Fee Schedule] and that individually or in the aggregate exceed $350.00 shall be agreed upon by [Pep Boys] and Stream on a case by case basis by an

amendment to this Agreement; any services which individually or in the aggregate are less than $350.00 shall be approved via email by Pep Boys designated personnel." (ECF No. 1-1 at PageID 34.) A contractual provision is ambiguous if it is "susceptible to more than one reasonable interpretation." *Planters Gin Co.*, 78 S.W.3d at 890. "In that situation, courts must resort to other rules of construction, and only if ambiguity remains after application of the pertinent rules does the legal meaning of a contract become a question of fact." *Johnson v. Welch*, No. M2002-00790-COA-R3CV, 2004 WL 239756, at *7 (Tenn. Ct. App. Feb. 9, 2004) (citation omitted). But courts are not to twist the language of a term "to find or create an ambiguity where none exists." *Id.* (citation omitted). The Court finds that the language and requirements of Section 1.6 are unambiguous.

Reading Section 1.6 in context with the entire Contract, the Court finds that if Stream performed any services not listed in the Fee Schedule that, either individually or in the aggregate, cost more than $350.00, the parties had to agree on those services case-by-case by an amendment to the Contract. If the cost of any service not listed on the Fee Schedule, individually or in the aggregate, was less than $350.00, the Contract required Stream to obtain approval from Pep Boys by email.

For example, if Stream contracts with a third party to reupholster one of Pep Boys' vehicles, and the fee to reupholster the vehicle cost $400.00, the plain language of the Contract would require Stream and Pep Boys to agree upon that fee in writing. Similarly, if Stream contracted with a third party to upholster a vehicle for $150.00 and contracted with another third party to store that same vehicle pending sale or redemption for $250.00, the Contract would require Stream and Pep Boys to memorialize their agreement in writing. If, in either example,

any of the individual or aggregate fees had equaled less than $350.00, Section 1.6 of the Contract would still require Stream to obtain Pep Boys' approval by email.

## 2. Payment

The Court finds that the language of Section 4.1, along with Section 1.6 and the Fee Schedule, answer what services Pep Boys expects to pay Stream for performing. Section 4.1 specifically answers how Pep Boys was going to pay Stream, and when those payments would occur. Section 4.1 states that Pep Boys will pay Stream for the fees listed on the Fee Schedule, in addition to fees which do not exceed $350.00 and "and for any services not contemplated by the [Fee Schedule] that exceeds $350.00 which are agreed upon by [Pep Boys] and [Stream] on a case by case basis by amendment to this Agreement." (ECF No. 1-1 at Page 34.)[5]

The "how" language in Section 4.1 unambiguously states that Pep Boys would pay Stream out of the proceeds generated by either the sale or redemption of a vehicle. (*See id.*) Finally, Section 4.1 provides that the timing of payment would occur "at such time as [a] vehicle is sold or redeemed." (*Id.*) Thus, the sale or redemption of a vehicle triggered payment to Stream. Section 4.3 provides additional details on timing, stating that "[n]et proceeds will be processed on a weekly basis by ACH, on a day agreed upon by Client and Stream for all vehicles sold for the prior seven (7) day period." (*Id.*) Sections 1.6 and 4.1 comport with the language of Section 11.4, which states that no amendment to any provision of the Contract will

---

[5] The Court notes that Section 4.1 does not contain the "individually or in the aggregate" language from Section 1.6 for either fees below or above $350.00, and it does not contain the email approval language for fees below $350.00. But, as Stream correctly states, the Court should "give[ ] reasonable meaning to all of [the Contract's] provisions." *Am. Devel., L.L.C. v. Parkside of Collierville, L.L.C.*, 102 F. App'x 890, 895 (6th Cir. 2004) (citation and internal quotation marks omitted). While it certainly would have been better for the parties to include identical language in Sections 1.6 and 4.1, the Court does not find the differences between the two sections to be ambiguous or in conflict with one another.

be valid unless the parties sign a separate written instrument specifically referencing the Contract.  (ECF No. 1-1 at PageID 38.)

### 3.    The Fee Schedule

The Fee Schedule lists the fees that Pep Boys would pay to Stream from the proceeds of the sale or redemption of a vehicle.  The Fee Schedule requires "positive weekly funds," which, read in context with the entire Contract, suggests that Stream guaranteed that a positive amount would remain after Stream deducted its fees for a given week.  (*See* ECF No. 1-1 at PageID 41.) Stream claims Pep Boys owes Stream whether its services net positive or negative returns for Pep Boys and that the "positive weekly funds" language applies only to the Remarketing Success Fee.  The Court finds nothing in the Fee Schedule restricting the guarantee of positive weekly funds to the Remarking Success Fee.  The plain language of the Fee Schedule conveys that the guarantee of positive weekly funds applies to the entire Fee Schedule, which means that Stream could not charge for fees that exceeded the amount of a vehicle's proceeds.  The Court's role here is not to rewrite contracts because one party is dissatisfied or the terms of a contract are harsh.  *See Marcum v. Ayers*, 398 S.W.3d 624, 629 (Tenn. Ct. App. 2012) (citations omitted).  The Court must interpret and enforce the Contract according to its plain terms.  *See McCullar*, 2012 WL 1097349, at *6.

### 4.    Allegations of Modification

Stream argues that if there is any ambiguity between "[g]uarantee positive weekly funds" in the Fee Schedule and "out of the sale proceeds at such time as the vehicle is sold or redeemed" in Section 4.1, the parties' course of dealing—Pep Boys' previous payment of invoices that included fees for alternative disposition methods and pass-through charges for storage—defeats Pep Boys' Motion.  (*See* ECF No. 13 at PageID 556—57.)  Stream claims that

"[t]here is no real dispute here" about the Contract's compensation structure because it accurately reflects Pep Boys' "needs[, which] included vehicles that were worth less than the amount necessary to generate a profit upon re-sale." (*Id.* at PageID 577.)  As a result of Pep Boys' needs, "the parties made an agreement that would benefit them whether or not a vehicle was sold:  Stream would be compensated according to a set schedule of fees, and [Pep Boys] would have abandoned vehicles removed from its property." (*Id.* at PageID 557.)

Despite Plaintiff's arguments and Rule 12(b)(6)'s favorable standard, they do not affect the Court's interpretation that the Contract is unambiguous and that its terms do not conflict with one another.  In sum, before Pep Boys owes any payment for services not on the Fee Schedule that, individually or in the aggregate, were over $350.00, the Contract requires Stream and Pep Boys to agree.  And Pep Boys needed to approve by email any of those same fees, individually or in the aggregate, totaling less than $350.00.  The sale or redemption of a vehicle had to occur before Pep Boys would pay Stream, and the Fee Schedule does not include storage fees.  Finally, if the parties wanted to execute a valid amendment to the Contract, they had to sign a written instrument that specifically referenced the Contract.

As a result, the Court could order Stream it recalculate its damages under the Court's interpretation of the Contract, and Stream could proceed with its remaining damages accordingly.  Yet the Court finds that Stream sufficiently alleges that the parties consulted and purportedly agreed upon alternative methods of disposition of Pep Boys' vehicles.  In particular, Stream alleges that it consulted with Pep Boys about alternative methods of disposition, and, in Pep Boys' best interest, Stream removed vehicles from Pep Boys' property and then crushed or otherwise disposed of them.  (ECF No. 1-1 at PageID 14.)  Then Stream claims that Pep Boys

ratified such alternative forms of disposition and paid invoices reflecting those fees through June 19, 2017.  (*See id.*)

Generally, Tennessee courts allow oral modification to contracts even if the contract language requires modifications to be in writing.  *Pollock*, 2009 WL 4980264, at *8 (quoting *Moulds v. James F. Proctor, D.D.S., P.A.*, 1991 WL 137577, at *3 (Tenn. Ct. App. July 29, 1991) (internal citation omitted)).  Even so, both parties must consent to the modification, *id.* (citing *Galbreath v.* Harris, 811 S.W.2d 88, 91 (Tenn. Ct. App. 1991) (internal citation omitted)), and "[b]ecause the modification of a contract constitutes a new contract, it requires consideration to support it."  *Id.* (citation omitted).

Thus, construing these allegations in the light most favorable to Stream and drawing all reasonable inferences in its favor, the Court finds that Pep Boys could have agreed to these alternative forms of disposition in accordance with the Contract.  For that reason, Stream's damages claims survive the Motion to Dismiss, and the Court DENIES Pep Boys' Motion to Dismiss Counts I and II of the Complaint.

## II.    *Quantum Meruit*/Unjust Enrichment

Next, Pep Boys argues that Stream's claims for the $133,157.50 for services that Stream performed under the Contract fails because the parties entered into a contract which covered those services.  (ECF No. 12 at PageID 544.)  And Pep Boys asserts that Stream's claims for "post-termination fees and storage fees" also fail because the alleged circumstances do not suggest that Pep Boys should have reasonably understood that Stream expected reimbursement for those services.  (*Id.*)  Stream barely responds to Pep Boys' argument and merely states that "[i]t would be unjust to allow Defendant to stick Stream with the vehicles and the tab now that Defendant has decided that it does not want to pay."  (ECF No. 13 at PageID 560.)

18

"Courts may impose a contractual obligation under an unjust enrichment theory if there is no contract between the parties or the contract has become unenforceable or invalid and the defendant will be unjustly enriched unless the court imposes an obligation." *Metro. Gov't of Nashville & Davidson Cty. v. Cigna Healthcare of Tennessee, Inc.*, 195 S.W.3d 28, 32 (Tenn. Ct. App. 2005) (citing *Paschall's, Inc. v. Dozier*, 219 Tenn. 45, 54, 407 S.W.2d 150, 154 (1966)). In essence, unjust enrichment is the same as claims of quasi-contract, quantum meruit, and contract "implied in law." *Id.* (citation omitted). Courts examine on an implied obligation and impose a contractual relationship between the parties when justice and equity require it. *See id.* (citation omitted). A party may recover equity damages if there is a contract implied in law, "a class of obligations which are imposed or created by law without the assent of the party bound, on the ground that they are dictated by reason and justice." *Id.* (quoting *Weatherly v. American Agric. Chem. Co.*, 16 Tenn. App. 613, 65 S.W.2d 592, 598 (1933)).

Pep Boys argument about Stream's unjust enrichment claim is correct. Concisely stated, "when an express contract exists between the parties, there can be no claim for unjust enrichment." *Jack Tyler Eng. Co., Inc. v. TLV, Corp.*, No. 07-2580 STA-dkv, 2008 WL 2998840, at *1 (W.D. Tenn. July 31, 2008) (citing *Arena v. Schulman, LeRoy & Bennett*, 233 S.W.3d 809, 815 (Tenn. Ct. App. 2006)). Because a contract existed between the parties here, the Court agrees with Pep Boys that Stream may not pursue its claim for the damages incurred before Pep Boys terminated the Contract under its unjust enrichment theory.

As for Stream's claims for post-termination and storage fees, however, the Court finds that Stream's claims may proceed under an unjust enrichment theory. A party wanting to recover under the equitable doctrine of *quantum meruit* must prove:

> (1)     There is not existing, enforceable contract between the parties covering the same subject matter;

(2)     The party seeking recovery proves that it provided valuable goods or
        services;

(3)     The party to be charged received the goods or services;

(4)     The circumstances suggest that the parties to the transaction should have
        reasonably understood that the person providing the goods or services
        expected compensation;

(5)     The circumstances demonstrate that it would be unjust for a party to retain
        the goods or services without payment.

*Swafford v. Harris*, 967 S.W.2d 319, 324 (Tenn. 1998) (citing *Castelli v. Lien*, 910

S.W.2d 420, 427 (Tenn. Ct. App. 1995); *Paschall's,* 219 Tenn. 45, 54, 407 S.W.2d at 154).

Similarly, the elements of an unjust enrichment claim are (1) "a benefit conferred upon the

defendant by the plaintiff; (2) appreciation by the defendant of such benefit; and (3) acceptance

of such benefit that it would be inequitable for him to retain the benefit without payment of the

value thereof." *Bennett v. Visa U.S.A. Inc.*, 198 S.W.3d 747, 755 (Tenn. Ct. App. 2006)

(internal quotation marks and citations omitted).

      No matter if Pep Boys terminated the Contract with or without cause, the Contract was no

longer in effect after July 2017, at the latest.  Thus, there was no enforceable, existing contract

between the parties as Stream, ostensibly, tried to continue disposing of Pep Boys' vehicles and

incur costs for their storage.  As a result, Stream sufficiently pleads that it conferred benefits

upon Pep Boys after the Contract's termination, Pep Boys appreciated that benefit, and that it

would be inequitable for Pep Boys to retain that benefit without compensation Stream.  "The

most significant requirement for a recovery on quasi contract is that the enrichment be unjust."

*Paschall's*, 219 Tenn. 45, 407 S.W.2d at 155.  The Court finds that this proposition contains the

essential inquiry into Stream's unjust enrichment claim—whether Pep Boys was *unjustly*

enriched given the applicable facts.  The Court cannot complete that inquiry by ruling on Pep

Boys' Motion to Dismiss. So, the Court DENIES Pep Boys' Motion to Dismiss Count III of the Complaint.[6]

### III.    Attorney's Fees Under the Contract

Under the Contract, each party must "fully protect, indemnify and hold harmless and defend [the other] . . . for any and all loss, demands, penalties, interest, actions or causes of action whatsoever, including costs, expenses and reasonable attorney's fees, in any manner arising out of, related to or in connection with, or resulting from: Any breach of th[e] Contract." (ECF No. 1-1 at PageID 35.) As mentioned before, breach is a question of fact for the fact-finder—here, the jury. *See Forrest Constr.*, 337 S.W.3d at 225. For this reason, the Court DENIES Pep Boys' Motion to Dismiss Count IV of the Complaint, which the jury will determine at trial.

### <u>CONCLUSION</u>

For these reasons, the Court DENIES IN PART AND GRANTS IN PART Defendant's Motion to Dismiss, (ECF No. 12).

**SO ORDERED**, this 19th day of July, 2018.

s/Thomas L. Parker
THOMAS L. PARKER
UNITED STATES DISTRICT JUDGE

---

[6] The Court does, however, DISMISS Plaintiff's claim for damages incurred before Pep Boys terminated the Contract under Count III (unjust enrichment).